**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2048-17T4

L.S.,

     Plaintiff-Respondent,

v.

J.S.,

     Defendant-Appellant.

_____

     Submitted February 11, 2019 – Decided April 25, 2019

     Before Judges Gooden Brown and Rose.

     On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FM-14-1170-13.

     J.S., appellant pro se.

     Gary Wm. Moylen, attorney for respondent.

PER CURIAM

     In this post-judgment matrimonial matter, defendant (ex-husband) appeals from two Family Part orders. He appeals from a December 4, 2017 order,

denying his motion to reconsider a June 22 and a July 7, 2017 order. The June 22 order denied his motion to terminate or reduce his alimony obligation to plaintiff (ex-wife), and the July 7 order awarded plaintiff $4970 in counsel fees. Defendant also appeals from a December 12, 2017 order, denying his motion for an order to show cause. We affirm.

The parties married in 1992 and divorced in 2014. Under the parties' June 2, 2014 matrimonial settlement agreement (MSA), which was incorporated into their final dual judgment of divorce of the same date, defendant agreed to pay "permanent alimony" in the amount of "$27,000 per year, payable in weekly installments of $519 through the New Jersey Support Payment Center." Under the MSA, defendant's alimony obligation would terminate "upon the death of [plaintiff] or her remarriage, cohabitation[,] or alimony buyout under the terms of th[e] [MSA]."

The MSA provided that the alimony provision was based upon the following factors:

> Both parties [were fifty-three] years old and in relatively good health. [Defendant] has been a contractor for his entire career.[1] The forensic

---

[1] According to the MSA, defendant "owns or has owned the following business enterprises: North Jersey Wildlife Control, LLC […], East Madison Assoc., LLC[;] Broadview Development Group, LLC[;] and Broadview Associates, LLC." Plaintiff "waive[d] all interest and/or claims to these businesses."

A-2048-17T4

accountant, Brian Corcoran, CPA, has determined his historical annual gross personal income to be between $115,000 and $130,000. Both parties dispute Mr. Corcoran's findings. [Plaintiff] believe[d] these amounts under-estimate [defendant's] income. [Defendant] believe[d] these amounts over-estimate his income. Over the past few years, [plaintiff] has worked as a part-time babysitter earning $15 per hour. She is now working full[-]time, earning gross income of approximately $450 per week, or $22,500 per year. [Plaintiff] agree[d] to the imputation of $25,000 gross income per year. Both parties [were] high school graduates. The parties have each certified to marital expenses of approximately $10,000 per month on their Case Information Statements [(CIS)] filed with the [c]ourt.

A handwritten addendum to the MSA provided:

For the first [eighteen] months or the sale of the marital residence, whichever first occurs, [defendant's] alimony obligation shall be reduced to one-half [or] $259.50 per week. The other one-half of this payment shall separately accrue for no longer than the [eighteen-month] period. During this time of accrual, the parties agree to a [two percent] annual interest on the unpaid amount. This unpaid amount shall be paid to [plaintiff] from [defendant's] share of the proceeds from the sale of the marital residence.

The marital residence referenced in the handwritten addendum was addressed under the equitable distribution section of the MSA. Specifically, the parties shared an "equal interest" in the marital residence, which had a "current selling price of . . . between $925,000 and $1,000,000." Defendant's mother also

3

"own[ed] a life estate on [the] property." Plaintiff was entitled to "sole occupancy and possession of the [m]arital [r]esidence" and "agree[d] that upon the consent of [defendant's mother] or upon a forced sale due to foreclosure, whichever first occur[red], the marital residence [would] be sold."

Paragraph 3.5 of the MSA delineated how the proceeds of the sale of the marital residence would be distributed. At closing, usual and customary costs, $100,000 for defendant's mothers' life estate interest, and any outstanding mortgages and loans on the property would be subtracted from the sale price. The remaining balance would be divided between both parties, with plaintiff receiving her one-half interest and the following amounts being paid to plaintiff from defendant's one-half interest: 1) $32,430.61 in pendente lite obligations; 2) one-half debt due on a Target credit card; 3) any outstanding support arrears; and 4) $4282.02 in medical bills. Any shortfall not covered by defendant's share would be added to defendant's support arrears.

Under Paragraph 3.21,

> [t]he parties agree[d] that the terms and provisions of this [MSA] act in full and complete satisfaction of any and all claims which either may have against the other, including their respective rights to equitable distribution under [N.J.S.A.] 2A:34-23. In further discharge of the claims of [plaintiff] for equitable distribution and alimony, [defendant] shall pay to

4

[plaintiff] the totals described in Paragraph 3.5 tax[-] free, from the sale of the marital residence.

Under the bankruptcy provision of the MSA, the parties agreed that "[a]ll of the provisions in th[e] [a]greement for the payment of money by either party [were] not dischargeable in bankruptcy" and that "the debts incurred by either [party] . . . [were] of such a nature that they [were] not dischargeable in a bankruptcy proceeding, whether voluntary o[r] involuntary." Regarding counsel fees in the event of a breach, the MSA provided:

> If either party defaults in the performance of any provisions of this [a]greement, and if the other party shall institute and prevail in legal proceedings to enforce the performance of such provisions by the defaulting party, then the faulting party shall pay to the other party, the necessary and reasonable court costs and attorney's fees incurred by the prevailing party in connection with such legal proceedings. . . . This provision is intended to be enforced as a freely bargained for contractual agreement, and a counsel fee claim for reimbursement pursuant to this provision is not intended to and shall not be subject to the [c]ourt's discretion under [Rule] 4:42-9(a).

The parties further acknowledged that in executing the MSA, "they have each been represented by counsel with respect to the negotiation, drafting, and execution of th[e] [a]greement." Both parties "specifically indicate[d] their satisfaction with the services of counsel, and further state[d] that they have had an adequate opportunity to discuss th[e] [a]greement, its provisions, and the

5

effects thereof with respective counsel[.]" Each party acknowledged that the MSA "contain[ed] the entire understanding of the parties, and there [were] no representations, warranties, covenants, promises or undertakings other than those expressly set forth" in the MSA. They "agree[d] that their future relations shall be governed and fully prescribed by the terms" of the MSA, and any "modification or waiver of any of the provisions . . . shall be effective only if made in writing." The parties also acknowledged that they were "entering into [the] [a]greement voluntarily, without threat, force, coercion[,] or duress . . . by any person[,]" and believed that the agreement was "fair, equitable, and appropriate under all of the circumstances of th[e] case" and "their respective individual best interests."

Thereafter, the parties engaged in extensive post-judgment motion practice. In 2016, the marital residence was sold for $321,771.60. Pursuant to a settlement agreement executed in a lawsuit filed by defendant's mother against the parties in connection with the sale of the marital residence, defendant's mother received $160,000, $130,000 of which was derived from the proceeds of the sale. On February 17, 2017, plaintiff filed an enforcement motion to compel defendant to pay her $519 per week in permanent alimony and to have the accrued alimony, with two percent interest, that was deferred from June 2, 2014,

6

until the resumption date of full alimony payments, added to defendant's support arrears as required under the MSA and handwritten addendum. Plaintiff also sought counsel fees. Defendant opposed the motion and cross-moved for termination or reduction of his alimony obligation based on changed circumstances. Although the motion judge directed defendant to provide supplemental financial documents, including five years of income tax returns, defendant only provided tax returns for three years, during which defendant reported earnings of $31,200 in 2014, $42,400 in 2015, and $41,600 in 2016.

On June 9, 2017, Judge Michael Paul Wright conducted oral argument on the motions,[2] during which defense counsel argued that defendant's "understanding" of "[P]aragraph 3.21" of the MSA was that "his obligation to pay alimony would terminate when the house was sold and [plaintiff] got the proceeds." Thus, according to defendant, Paragraph 3.21 constituted a "buy out" provision. Alternatively, defendant argued for reduced alimony because he was now remarried with an eleven-month-old child, caring for his sick mother, unemployed, and having trouble finding work because of his health and age.

---

[2] At oral argument, defense counsel submitted to the court the parties' 2012 income tax return when they were still married, showing a net income of $50,000.

A-2048-17T4

In a June 22, 2017 order, Judge Wright granted plaintiff's motion in its entirety and denied defendant's cross-motion. In his accompanying six-page statement of reasons, after reciting the applicable legal principles[3] and the pertinent provisions of the MSA, the judge rejected defendant's argument that the sale of the marital residence and distribution of the proceeds terminated his alimony obligation. The judge explained:

> The boilerplate integration language contained in [P]aragraph 3.21 cannot reasonabl[y] be read to excuse [d]efendant's alimony obligation, especially when read in conjunction with the alimony-specific provisions of the MSA. Paragraph 2.2 indicates [d]efendant's alimony obligation is "permanent." Paragraph 2.3 lists several termination events for [d]efendant's alimony obligation. Plaintiff's receipt of proceeds from the sale of the marital home is not one such event. The [handwritten] addendum reference[s] both alimony

---

[3] See Massar v. Massar, 279 N.J. Super. 89, 93 (App. Div. 1995) ("Marital agreements are essentially consensual and voluntary and as a result, they are approached with a predisposition in favor of their validity and enforceability."); Rosen v. Rosen, 225 N.J. Super. 33, 36 (App. Div. 1988) ("However, courts have allowed modification of property settlement agreements under the catch-all paragraph (f) of [Rule] 4:50-1, . . . where there is a showing of inequity and unfairness."); Konzelman v. Konzelman, 158 N.J. 185, 194 (1999) ("Courts have continuing power to oversee divorce agreements . . . and the discretion to modify them on a showing of 'changed circumstances,' . . . that render their continued enforcement unfair, unjust, and inequitable.") (citations omitted); Crews v. Crews, 164 N.J. 11, 24 (2000) ("Courts have the equitable power to . . . revise [alimony] orders . . . 'on a showing of changed circumstances.'" (quoting Lepis v. Lepis, 83 N.J. 139, 146 (1980))).

payments and the proceeds of the sale of the marital home. The addendum similarly does not provide for alimony termination upon the distribution of these proceeds.

See Flanigan v. Munson, 175 N.J. 597, 606 (2003) ("In interpreting a [property settlement agreement], [i]t is not the real intent but the intent expressed or apparent in the writing that controls." (second alteration in original) (quoting Garfinkel v. Morristown Obstetrics & Gynecology Assocs., 168 N.J. 124, 135 (2001))); Miller v. Miller, 160 N.J. 408, 419 (1999) ("Given the absence of unconscionability, fraud, or overreaching in the negotiations of the settlement, . . . no legal or equitable basis exists to reform the parties' property settlement agreement.").

Turning to defendant's alternate request for a reduction of alimony, the judge determined "[d]efendant ha[d] not established a prima facie showing of changed circumstances" and denied the request without prejudice. The judge noted that "[c]ourts have consistently rejected requests for modification based on circumstances that are only temporary or which are expected to occur but have not yet occurred." See Lepis, 83 N.J. at 151. According to the judge, "[d]efendant's motion papers simply advance[d] a naked assertion that he [was] no longer making the sums of money he did previously." Judge Wright was

unpersuaded, particularly since "[d]efendant's financial status [was] totally unverified by any persuasive proofs." The judge explained:

> Defendant's 1040s indicate that from 2014 through 2016, [d]efendant earned a combined total income of $115,200. During those years, [d]efendant report[ed] paying alimony in the amount of $67,467. The [c]ourt is leery of these numbers given that—if accurate—[d]efendant's only available income for these three (3) years was the $47,733 that remain[ed] after deducting alimony. . . . Moreover, [d]efendant's previously filed CISs do not indicate that [d]efendant has liquidated any significant assets during this time. In fact, [d]efendant's CIS dated October 1, 2015[,] values his total assets at [$8000]. Defendant's CIS filed March 31, 2017[,] values his total assets at [$7000].
>
> The "numbers" simply do not add up. . . . Defendant provides no W-2s or profits and loss statements with his tax returns. If anything, it appears [d]efendant has been able to pay alimony for several years despite his argument regarding reduced income. Moreover, [d]efendant has failed to demonstrate any reduced income is involuntary. . . .

In that regard, Judge Wright referenced the findings detailed in a September 15, 2014 order by a prior judge, stating:

> Defendant claims his current employment has left him in dire financial straits, however, it seems . . . [d]efendant has willfully terminated his own more lucrative business ventures in an effort to frustrate the [o]rders of this [c]ourt and the provisions of the parties' [MSA]. . . . [T]he court notes [d]efendant's continual defiance of [c]ourt [o]rders and his recalcitrant behavior throughout the litigation of this matter. . . .

10

> [T]his behavior continually delayed or otherwise frustrated the proceedings in this matter, resulting in duplicative enforcement motions. . . . [Defendant's] reliance on the argument that his financial circumstances have changed dramatically and therefore render him unable to contribute towards these costs is directly related to his choice to abandon his previously successful business ventures. Defendant's scorched earth position cannot be countenanced[.]

Relying on Larbig v. Larbig, 384 N.J. Super. 17, 23 (App. Div. 2006), Judge Wright stated "[c]ase law in fact tells the [c]ourt to be leery of self-employed individuals, as they are in 'a better position to present an unrealistic picture of [their] actual income than a W-2 earner.'" Thus, Judge Wright rejected defendant's claim of changed circumstances warranting modification pursuant to Lepis, 83 N.J. at 151. Further, after analyzing the applicable factors under Rule 5:3-5(c), Judge Wright granted plaintiff's request for counsel fees subject to the submission of a certification of services as required under Rule 4:42-9(b). The judge found that "[t]he majority of [d]efendant's requests were either denied or denied without prejudice," and plaintiff "[was] in the inferior financial position." Upon submission of the requisite certification of services, in a July 7, 2017 order, Judge Wright awarded plaintiff counsel fees in the amount of $4970, payable within thirty days.

On July 31, 2017, defendant moved for reconsideration of the June 22 and July 7, 2017 orders, and, for the first time, requested an order compelling plaintiff to pay him alimony. In support of his uncounseled motion, defendant certified that, when the judge concluded that his assertions were "contrary to the evidence," the judge failed to consider the financial documents he previously submitted, including his 2014, 2015, and 2016 tax returns, a life insurance quote, unemployment checks, and his most recent bank statement showing a $5 balance. He also certified that his income had been reduced by "more than [seventy-five percent]" over "almost [thirty-two] months due to involuntary poor economic circumstances in construction" as evidenced by several news articles he referenced. He also accused the "[c]ourt [of] . . . recast[ing], revis[ing,] or rewrit[ing] the MSA" by stating that his understanding was unreasonable, and accused plaintiff and her attorney of making "false representation[s]" to the court about him "hiding money" and "fraudulent claim[s] that the [MSA does not] say what it means[.]" Additionally, he accused Corcoran of "violat[ing] . . . the law[] and [professional] regulations" in his valuation of defendant's business that was used in the MSA.

Plaintiff opposed the motion and cross-moved for an order incarcerating defendant until he complied with the June 22 and July 7 orders. To refute

defendant's claims of poverty, plaintiff submitted "a monthly bank statement of [defendant's] company 'North Jersey Wildlife Control LLC […],'" showing monthly deposits of $153,845.61, $184,477.37, and $175,000. Plaintiff also provided a joint bank statement in the names of defendant and his new wife showing a $3500 deposit, which, according to plaintiff, provided evidence of defendant's ability to "hide income." In reply, defendant certified that the bank deposits were "[four-and-one-half] to [five] years old." He also submitted his Chapter 7 bankruptcy petition dated August 31, 2017, and a May 13, 2014 email from defendant to plaintiff's attorney discussing a possible alimony buyout.

In a December 4, 2017 order, Judge Wright denied defendant's motion in its entirety and granted, in part, plaintiff's request to incarcerate defendant for noncompliance. In his eight-page statement of reasons, the judge found that "[d]efendant fail[ed] to provide new persuasive evidence" to support "his position" that the court "overlook[ed] his financial information, his closed business, . . . his reduction in income[,]" or "his dire financial circumstances[.]" According to the judge, defendant "fail[ed] to establish that the [c]ourt failed to appreciate the significance of probative evidence" or that "the [c]ourt . . . made its decision on an incorrect basis of facts[,]" as required for relief on a motion for reconsideration under Rule 4:49-2 and Cummings v. Bahr, 295 N.J. Super.

374, 384 (App. Div. 1996). Instead, the judge stated "[d]efendant simply disagree[d] with the [c]ourt's analysis." See Palombi v. Palombi, 414 N.J. Super. 274, 288 (App. Div. 2010) (explaining that reconsideration "is not appropriate merely because a litigant is dissatisfied with a decision of the court or wishes to reargue a motion"); Town of Phillipsburg v. Block 1508, Lot 12, 380 N.J. Super. 159, 175 (App. Div. 2005) ("A motion for reconsideration is properly based on 'matters . . . which counsel believes the court has overlooked or as to which it has erred.'" (alteration in original) (quoting R. 4:49-2)).

In particular, Judge Wright noted "[d]efendant [did] not specify certain facts for the [c]ourt to reconsider, but [made] bold statements of dissatisfaction with the [c]ourt's decision." For instance, [d]efendant

> provide[d] no bank statements, no tax returns, or anything else that would indicate the status of his financial circumstances. He simply allude[d] to documents and cite[d] a two . . . page letter that refer[red] to these documents as attachments without providing the actual documents. . . . Additionally, defendant [did] not provide proof of his seventy-five percent . . . reduction in income with anything other than news articles regarding the state of the economy.

Thus, the judge concluded defendant "provide[d] no new arguments that persuade[d] the [c]ourt its previous analysis was incorrect."

14

Likewise, the judge determined defendant's argument "that the [c]ourt attempted to 'recast' the parties[' MSA] when disagreeing with [defendant's] interpretation of Paragraph 3.21" failed "to meet his burden for a motion for reconsideration." Judge Wright pointed out that rather than "provid[ing] evidence demonstrating the [c]ourt's interpretation as unreasonable" or "cit[ing] to any prior communication that would clarify any of the alleged ambiguity of the language between both parties[,]" defendant "simply challenge[d] the [c]ourt's analysis . . . regurgitating the same arguments previously offered." Regarding defendant's newly minted request for plaintiff to pay him alimony, the judge noted that the motion was "not appropriate on reconsideration[.]" Nonetheless, the judge denied the motion on the merits, explaining that by providing defendant's "bank statements which point to better financial circumstances than . . . [d]efendant would like the [c]ourt to believe[,] . . . [p]laintiff . . . provided the court with good cause to deny [defendant's] request for alimony."

Turning to plaintiff's cross-motion, Judge Wright explained that when a party fails "to comply with the terms of an order[,]" a "litigant may seek relief from the [c]ourt" pursuant to Rule 1:10-3. According to the judge, such relief is appropriate where the party's "recalcitran[ce]" justifies an order "to coerce

15

compliance" and the judge "find[s] on the record that the delinquent party has the ability to comply with the order enforcing litigant's rights." See Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 392 (1995).

The judge found that:

> Defendant has failed to comply with several court orders for payment of alimony, dating back to 2014. Likewise, [d]efendant's conduct of noncompliance has been noted in the language of prior [c]ourt [o]rders . . . . Additionally, [d]efendant has continued to file frivolous litigation with his current [m]otion for [r]econsideration in order to prolong litigation and continue to avoid compliance with the [c]ourt's prior [o]rders.
>
> . . . Defendant has a history of noncompliance that continued to prejudice [p]laintiff.

As a result, Judge Wright ordered that:

> Defendant shall make a good faith payment of ten thousand dollars . . . within seven . . . days of the date of this [o]rder. Should [d]efendant fail to make said payment, upon . . . [p]laintiff's certification of noncompliance, the [c]ourt will immediately schedule an enforcement hearing exposing . . . [d]efendant to immediate incarceration. Likewise, should [d]efendant fail to pay [p]laintiff the remaining arrears within the time frame mandated, upon [p]laintiff's certification of noncompliance, an enforcement hearing will be scheduled exposing defendant to further incarceration.

On December 11, 2017, defendant filed a motion for an order to show cause, requesting an ability to pay hearing, an "indigency" hearing, a plenary

hearing regarding the interpretation of the MSA, and an order restraining plaintiff from seeking defendant's incarceration. In a supporting certification, defendant reiterated his prior arguments, stated he "continue[d] to be irreparably harmed and damaged with threats of incarceration based on inadmissible, fraudulent evidence[,]" and requested a stay of the December 4 order. In a December 12, 2017 order, Judge Wright denied defendant's application without prejudice. In rejecting defendant's application, the judge found that "[d]efendant fail[ed] to provide proof of service" in compliance with Rule 4:52-1(a), and "failed to establish irreparable harm" pursuant to Crowe v. De Gioia, 90 N.J. 126, 132-34 (1982).[4] On January 3, 2018, defendant filed the instant notice of appeal.

Defendant argues the judge abused his discretion[5] by denying his motion for reconsideration of the June 22 and July 7 orders, and deprived him of "all

_____

[4] On December 14, 2017, we denied defendant's emergent application, seeking a stay of the December 4 order, noting that "[i]f arrested, the trial court must conduct an ability to pay hearing before defendant can be incarcerated." On December 15, 2017, over defendant's objection, plaintiff's attorney filed a certificate of non-compliance with the court, averring that defendant failed to comply with the December 4 order and requesting an enforcement hearing.

[5] An "abuse of discretion only arises on demonstration of 'manifest error or injustice,'" Hisenaj v. Kuehner, 194 N.J. 6, 20 (2008) (quoting State v. Torres, 183 N.J. 554, 572 (2005)), and occurs when the trial judge's decision is "made

[d]ue [p]rocess [r]ights." Defendant asserts the "[j]udge made his decision on palpably incorrect reasoning," which was "based on stale and inadmissible financial and income proofs." According to defendant, the judge failed to consider evidence of his "changed circumstances[,]" particularly that his income had been "substantially reduced," and "failed to consider and weigh" the statutory factors enumerated in N.J.S.A. 2A:34-23(b).[6] Further, defendant contends the judge's decision was based on a palpably incorrect interpretation of the MSA, rendering the "order . . . unjust" or "inequitable." Additionally, defendant contends the judge erred in denying his motion for an order to show

---

without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (quoting Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002)).

[6] We note that the fourteen enumerated factors were part of the amendments to N.J.S.A. 2A:34-23(b), enacted on September 10, 2014, over three months after the execution of the MSA and the entry of the final judgment of divorce in this case. Because the Legislature specified that the amendment would not be applied retroactively to modify "any enforceable written agreement between the parties" in effect prior to the amendment, L. 2014, c. 42, § 2, it is not applicable to this case.

cause because an application of the <u>Crowe</u> factors[7] "support[ed] the issuance of emergent relief."

We have considered defendant's contentions in light of the record and applicable legal principles and conclude they are without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E). We affirm substantially for the reasons expressed by Judge Wright in his comprehensive, cogent, and well-reasoned statement of reasons accompanying the December 4 and 12, 2017 orders.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[7] Under <u>Crowe</u>, a party seeking interim injunctive relief must demonstrate: (1) whether the injunction is "necessary to prevent irreparable harm"; (2) whether "the legal right underlying [the] claim is unsettled"; (3) whether the applicant has made "a preliminary showing of a reasonable probability of ultimate success on the merits"; and (4) "the relative hardship to the parties in granting or denying [injunctive] relief." 90 N.J. at 132-34.

A-2048-17T4